WHITE v. MAKELA.

1. DAMAGES—HEAD, SHOULDER, ARM, CHEST AND KNEE INJURIES.
   Verdict of $3,750 in action for injuries sustained in automobile collision by 53-year-old blacksmith whose nose was cut in two places, both eyes blackened, and who had contusions on shoulders, arms and chest and severe injury to right knee was not such as to shock the judicial conscience.

2. APPEAL AND ERROR—DAMAGES—GREAT WEIGHT OF EVIDENCE—PREJUDICE—SYMPATHY.
   The Supreme Court does not disturb the determination of the trier of the facts in respect to award of damages where it is not such as to shock the judicial conscience, is not against the great weight of the evidence and has not been secured through improper methods, prejudice or sympathy.

3. SAME—REFERENCE TO INSURANCE—MISTRIAL—INSTRUCTIONS.

Casual remark as to defendants' being insured, made by plaintiff in narrating what took place at time of automobile accident, followed by request for mistrial and denial thereof with instruction to jury to pay no attention thereto then as well as in the charge to the jury did not constitute prejudicial error, where such remark had not been invited by plaintiff's counsel and matter of insurance was not otherwise referred to by any witness, counsel or court.

4. SAME—INSURANCE—PREJUDICE—DAMAGES.

The mere fact that defendant in a personal injury case has insurance reaches the ears of the jurors during the trial does not constitute reversible error, unless an improper use of it is made by counsel for the evident purpose of inflaming the passions of the jury and thereby affecting the result or increasing the size of the verdict or unless such testimony was designedly injected into the case for such purpose or purposes.

Appeal from Marquette; Bell (Frank A.), J. Submitted January 7, 1943. (Docket No. 50, Calendar No. 42,206.) Decided February 23, 1943.

Case by Alphonse White against Earl and Marcella Makela, for personal injuries sustained as a result of an automobile collision. Verdict and judgment for plaintiff. Defendants appeal. Affirmed.

*Aaron Lowenstein*, for plaintiff.

*McGinn & Kueber*, for defendants.

CHANDLER, J. On December 5, 1941, plaintiff was injured as the result of a collision between an automobile driven by himself and an automobile owned by defendant Earl Makela and being driven by defendant Marcella Makela, his wife, on U. S. highway 41 in the county of Marquette.

Following this accident, suit was instituted, the case being tried before a jury who rendered a verdict against both defendants in the sum of $3,750.

Defendants moved for a new trial on the grounds: (1) that plaintiff's testimony informed the jury that the defendants were insured and that this constituted prejudicial error; and (2) that the verdict was excessive. The motion was denied by the trial court, and this appeal followed.

Inasmuch as these are the only questions involved on this appeal, and it is our view that the first question is of minor importance if the verdict was not excessive, we will discuss them in the inverse order in which they are stated.

Distinguishing this from most personal injury cases as a result of automobile accidents, there is but very little, if any, conflict of testimony on the question of negligence or the nature and extent of plaintiff's injuries.

Plaintiff's testimony as to his injuries is as follows:

"My nose had two bad cuts way up here on the bridge of the nose. It was bleeding terribly. My knee was injured very severely, so I could hardly put my weight on it. I just dragged myself. My shoulders were bruised, arms, chest. My eyes were blackened; terribly blackened. The blackening of my eyes didn't start until about the next day, and I had the best pair of black eyes ever seen on anybody; the blackening of my eyes extended below my nose and on my cheeks as far down as my upper lip, and my eyes remained with me for about three weeks. There were no bones broken in my nose but I felt the injury to my nose for about two months. I braced my right foot on the floor board when I saw that the crash was coming, and when the crash

came I imagine my right knee must have went up against the dashboard. That is what caused the injury to my knee. I know that the crash caused the injury to my knee. I saw Dr. Mudge that afternoon; and I saw him continuously thereafter, on account of my injuries two or three times a week for that whole month that I was unemployed, and I seen him at different intervals after that, and I still see him. He was going to give me special treatment for the knee. I was unable to work for one month. I was able to get around on that foot after I was hurt with the use of a cane which I used for about two weeks I would say. The bruising on my arms and shoulders continued about a week. On January 3, 1942, I came to Marquette. I was requested to go to Dr. Hirwas for an examination and also an X-ray picture. I went to Dr. Hirwas. He sent me to St. Mary's Hospital for an X ray. They took three pictures of that knee. I then came back from the hospital and went to Dr. Hirwas and he gave me a thorough examination. He wanted me to have the knee taped or operated on. * * * I was injured on December 5, 1941, and I was examined January 3, 1942; that would be pretty near one month after the crash. I went back and tried to work on January 5, 1942; Dr. Hirwas didn't recommend me to go to work—he didn't want me to go to work—he advised me not to go to work. I went because my doctor in Negaunee told me it would probably be better if I went and tried it, but by being careful and favoring the knee as much as I possibly could maybe I could get along with my work, which I did.

"*Q. By Mr. Lowenstein* (plaintiff's attorney): Mr. White, what effect, if any, did the crash have upon your ability to work?

"*Witness:* Well, this knee bothered me terribly. It bothers me all the time. In my line of work I have to go any place, any work that has to be done, climbing up in the shaft house, or any other place,

I have to do it, and this knee bothers me very much when I have to climb or get down and turn in different positions.

"*Q. By Mr. Lowenstein:* Are you able to move your knee freely?

"*Witness:* No, I can't stretch it out straight or bend it back. In either position if I try to put it it pains me.

"*Q. By Mr. Lowenstein:* Is that condition still present today?

"*Witness:* It still exists today. I was making $200 a month or better in wages immediately before this crash and my wages is $7.04 for five days and time and a half for every Saturday on all overtime now. As a result of the crash I incurred doctors' bills to the amount of $45; $5 for X rays in the hospital, $35 to Dr. Mudge, and $5 to Dr. Hirwas, for two examinations. * * *

"I had a bill of $12 for towing that wreck to the garage and back home again, and also storage.

"*Q. By Mr. Lowenstein:* Mr. White, how does your right knee feel today?

"*Witness:* It still pains me. It bothers me at times worse than others.

"*Q. By Mr. Lowenstein:* Did it give you any cause for complaint prior to the crash of December 5, 1941?

"*Witness:* No, it did not.

"*Q. By Mr. Lowenstein:* Mr. White, will you please tell us to what extent your job as a blacksmith occasions you to be on your feet or to climb?

"*Witness:* It requires me to be on my feet almost continuously.

"*Q. By Mr. Lowenstein:* And how many years did you say you had been working as a blacksmith?

"*Witness:* 28 years. My ability to do my work today is affected by the condition of my knee to a certain extent; I can't move around freely, and the way I stand I do my work but it pains me to get

around to do my work. I wouldn't say the weather bothers me so much or has an effect on it; I haven't noticed."

Dr. Mudge, plaintiff's regular physician, was not produced as a witness because of his absence from the county and State at the time of the trial. Plaintiff's attorney had taken out a subpoena for said physician, but he had left for Springfield, Illinois, to attend his son's wedding before the subpoena could be served.

Plaintiff thereupon produced Dr. Hirwas who had examined him on two occasions before the trial and once during the trial, who testified as follows:

"I practice in Marquette. In regard to my experience in treating injuries to the knee, such injuries you have in the line of general practice, as well as a few years I spent in industrial practice in the mining companies. I examined Mr. Alphonse White, plaintiff in this case, first on January 3d of this year, and I examined him at a period since, but I don't recall the exact date but I would say March 14th; and I examined him again about 10 minutes ago. At that time in January, I obtained a history from Mr. White as to the cause of the disability he complained of, and he gave me the following history. He gave his age as 52, and his address as Negaunee, Route 1; occupation as a blacksmith. His first complaint was soreness and swelling of his right knee, and injuries to the right shoulder and arm. He also stated he had had a cut on his nose, and injury on his arm. He stated an accident occurred on December 5, 1941, while he was driving his car on US-41 between the Perala farm and the Carp River bridge. He stated he was struck by a car driving west. The impact caused him to injure his right knee, his right shoulder and arm, and lacerated his nose. He was shortly after attended by Dr. Mudge at Negaunee. * * * Con-

tinuing with his bone and joint examination, his
right shoulder and arm did not show any limitation
of motion, or any pain. The right knee was pain-
ful on flexion and extension, that is straightening
it out and bending it backward. There was also
definite tenderness on both sides of the patella.
The right knee, on measuring with a tape measure
right over the center of the patella, or the knee cap,
showed it to measure 14⅛ inches in circumference.
The left knee which he stated was the uninjured
knee, measured 13½ inches. On palpation of the
knee there was a feeling of fluid and on inspection
it was visible that the bursa of the knee contained
fluid. There was ballottement present. The rest
of his joints, that is the hips and ankles and feet
in general were normal. There was no other ab-
normality. The skin and lymph glands were nor-
mal, with the exception of a small, healed cut over
the bridge of his nose. My diagnosis was first
traumatic bursitis with effusion of the right knee,
healed contusions of the right shoulder and arm,
and healed lacerations of the nose. That was the
extent of the examination. I have seen an X-ray
report. This X ray was taken January 3, 1942.
The interpretation is as follows: anterior-posterior
and lateral X ray of the right knee reveals no evi-
dence of fracture or dislocation of the patella, fe-
mur, tibia, or fibula, no sign of arthritis, no abnor-
mal or articulatory surfaces.

"*Q. By Mr. Lowenstein:* Did you find, doc-
tor, any limitation in Mr. White's movement of
that knee?

"*Witness:* Yes, I did. He had limitation of mo-
tion of flexion and extension.

"*Q. By Mr. Lowenstein:* Doctor, you men-
tioned that ballottement was present. Will you tell
the court and jury what that means?

*Witness:* Ballottement is a method of elicit-
ing the presence of fluid in the joint surface. For
instance, you can put your hand on one side of the

knee and give the opposite side a tap with your hand and you will feel a motion or movement, of fluid against your opposite finger.

"*Q.  By Mr. Lowenstein:* And you found fluid in Mr. White's right knee on that occasion?

. "*Witness:* Yes.  Those are the findings, based upon my examination of Mr. White on January 3, 1942.  At the time I stated that Mr. White should remain off of the knee if it was painful, which he stated it was.  I also recommended that the fluid be aspirated and removed from the knee joint to hasten the healing.

"*Q.  By Mr. Lowenstein:* You examined Mr. White today, doctor?

"*Witness:* Yes.

"*Q.  By Mr. Lowenstein:* Did you take measurements of his knee?

"*Witness:* Yes.

"*Q.  By Mr. Lowenstein:* Will you tell us, please, whether or not the swelling of the right knee has subsided or what the condition is there?

"*Witness:* The measurements revealed that the injured knee was of the same measurement as at the time of my examination, January 3d.  That condition is still present today; I found no evidence of fluid in the knee, however, when I examined him today; it was all absorbed.  On inspecting the knee, there was an appearance that the inner surface of the knee was larger in the injured knee than the normal knee would probably indicate the presence of scar tissue; at this date it would indicate the presence of scarring.

"*Q.  By Mr. Lowenstein:* What effect would the presence of scarring have upon Mr. White's ability to move that knee?

"*Witness:* It might cause pain and it might cause some limitation of motion.

"*Q.  By Mr. Lowenstein:* Doctor, what importance, if any, do you attribute to an injury of this type to a knee in a man like Alphonse White, who

is 53 years of age? What is the relative importance of the knee joint?

"*Witness:* Well, the knee joint, of course, supports, with its opposite member, the weight of the whole body, and it is more or less of a fulcrum in certain movements, and it is of a great deal of importance in this respect that it supports the weight of your body.

"Traumatic indicates a blow, it means physical force striking any part of your body. Bursitis indicates an inflammation of the sac that inclosed the knee joint. There are several of them. And effusion means an accumulation of fluid into the series of sacs.

"*Q. By Mr. Lowenstein:* Doctor, is there anything that can be done to reduce this five-eighths inch swelling at the present time in your opinion?

"*Witness:* In my opinion I don't know of anything to reduce the scarring or the callous formation that has occurred there at this stage.

"*Q. By Mr. Lowenstein:* Do you believe that will be with Mr. White as long as he lives or that there is any probability of it?

"*Witness:* Well, there is a probability of it I should think gradually subsiding rather than getting larger. On the other hand it may remain the same.

"*Q. By Mr. Lowenstein:* So then you can't say with any certainty what the knee is going to be years hence?

"*Witness:* No.     *     *     *

"*Q. By Mr. Kueber (defendants' attorney):* Now the fact that there may be scar tissues present in this knee, does that necessarily mean that this man will be disabled the rest of his life?

"*A.* I don't know what the future would show, that is, a year from now, or six months from now, quoting a time, whether there may be improvement or whether it will remain stationary.

"*Q. By Mr. Kueber:* Well, doctor, I realize you can't look into the future here. However, you can

base it on your experience in other cases, can you not? * * *

"*Witness:* Well, in previous cases that I have seen knee injuries slowly improve. In many cases if they are subject to previous injury they frequently revert back to their former injured state. That is, they are more easily injured. Based on the fact that there has been improvement in that knee in the past three months, I would anticipate further improvement. Possibly the fact that Mr. White was able to do his work as blacksmith since January 3d up to the present and the knee showing some signs of improvement as far as physical examination is concerned, one would reasonably expect possibly some improvement in the future. I would expect such improvement to be more probable than possible. * * *

"*Q. By Mr. Lowenstein:* I cannot say with certainty that there will be improvement in this knee so as to relieve Mr. White entirely of this condition in the future; there are chances that that knee might continue to bother him. The fact that there is a limitation of motion, the fact that there is pain on flexion and extension, and the fact that there is tenderness on pressure on either side of the patella, makes me still believe he still has some trouble in his knee."

In view of the quoted testimony which was uncontradicted, and the determination by the trial court, in denying appellants' motion for a new trial, that the verdict was not such as to shock the judicial conscience, and in view of our holdings that we do not substitute our judgment on this question for that of the triers of the facts, unless the verdict is against the great weight of the evidence, or has been secured by improper methods, prejudice or sympathy, none of which appear to be present here, we are not inclined to disturb the verdict of the

jury who under the supervision of the trial court are the triers of the facts. See *Watrous* v. *Conor,* 266 Mich. 397; *Sebring* v. *Mawby,* 251 Mich. 628; *Odel* v. *Powers,* 284 Mich. 201; *Perl* v. *Cohodas, Peterson, Paoli, Nast Co.,* 295 Mich. 325; *Hanson* v. *Economical Cunningham Drug Stores, Inc.,* 299 Mich. 434.

During the direct examination of plaintiff on the trial, he was asked this question: ''Mr. White, will you tell the court and jury, please, what, if anything, took place on that occasion?'' Plaintiff thereupon detailed in narrative form what took place at the time of the crash, concluding his testimony with the following statement.

''After that Mr. Barabee said to me, 'Do you want me to take you to the hospital?' I said, 'No, you take care of the ladies. I think I will manage. I will get along. I will make it all right.' About that time the whole wreckage had been cleared and traffic started to move, and as Mr. Barabee made arrangements to take care of these two women, this woman started to leave, I said to her, 'What is your name?' She says, 'My name is Marcella Makela. I live in Negaunee on Main street near to the Episcopal church. My husband is manager of the Shell bulk plant at Teal lake. It is all my fault. Everything will be taken care of. It is all covered by insurance.'

''*Mr. Kueber (defendant's attorney):* I object to that and I move for a mistrial at this time.

''*The Court:* Strike that out.

''*Mr. Kueber:* I move for a mistrial.

''*The Court:* I think it is unfortunate, but I think I will deny the motion. I will say now, the jury will pay no attention to that remark. It is a most unfortunate remark. We are not trying any case against an insurance company.''

In his charge to the jury, the court gave the following instruction on the question of insurance.

"You have also heard that the question of insurance has crept into the case. It shouldn't have come here and you and I are required to be big enough and honest enough to treat the case as a case between these parties and not to consider in any way the question of insurance, because there is no insurance company sued here. They are not a party to this litigation, and so just put that right out of your minds and dispose of the case on the evidence."

No other or further reference to the question of insurance was made by any witness, by counsel, or by the court.

In the order denying defendants' motion for a new trial, the trial court made this finding.

"Defendants claim that reference to insurance in the course of plaintiff's testimony was prejudicial. Plaintiff testified in effect that shortly after the collision, defendant, Marcella Makela, said to plaintiff: 'It's all my fault. Everything will be taken care of. We are fully insured.' Plaintiff's testimony in this regard came into the case incidentally. It was not invited by plaintiff's counsel nor was it the result of any purpose on the part of plaintiff's counsel to present to the jury the fact of insurance. The jury was immediately cautioned. The Supreme Court has passed upon similar casual statements. In view of the circumstances, the sole reference to insurance in this case does not constitute prejudicial error."

We have had occasions to discuss the question here raised, and our conclusions have quite uniformly been that the mere fact that the defendant has insurance has reached the ears of the jurors during the trial does not constitute reversible error,

unless an improper use of it is made by counsel for the evident purpose of inflaming, the passions of the jury and thereby affecting the result or increasing the size of the verdict, or unless such testimony was designedly injected into the case for such purpose or purposes. See *Sutzer* v. *Allen,* 236 Mich. 1; *Nicholas* v. *Maxwell Motor Corp.,* 237 Mich. 612; *Morris* v. *Montgomery,* 229 Mich. 509; *Nicewander* v. *Diamond,* 302 Mich. 239. In the instant case, the issue of defendants' liability was not involved, and the record of the trial and proceedings is barren of prejudicial error.

The judgment is therefore affirmed, with costs to plaintiff.

BOYLES, C. J., and NORTH, STARR, WIEST, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred.