PERL *v.* COHODAS, PETERSON, PAOLI, NAST CO.

1. NEGLIGENCE—INVITEES—SAFE MEANS OF INGRESS AND EGRESS.
   An invitee is a person who enters a place of business for purposes connected with the business conducted thereon, a status which is occupied also by a servant who enters the premises for purposes of conducting business of mutual interest to his master and the owner of the premises, and the owner has the duty of affording invitees a reasonably safe means of ingress and egress.

---

As to definition of classes of business visitors and invitees, see 2 Restatement, Torts, § 332.

For the rule on liability of the possessor of land to business visitors for dangerous condition on the land, see 2 Restatement, Torts, § 343, and as to the area open to business visitors and included in the invitation, see 2 Restatement, Torts, § 343, comment b.

2. SAME—INVITEES—LICENSEES—WAREHOUSE PLATFORM—QUESTION FOR JURY.

In action by railroad company's warehouse foreman for injuries he sustained as he was descending ice-covered steps from warehouse platform adjacent to railroad's right of way in order to obtain entrance to warehouse through doors other than those from platform which were then locked, question of whether or not plaintiff was an invitee or a licensee of the warehouse owner *held*, for jury where there is testimony that plaintiff had used premises in such a manner for years and that there was general public use of the platform for purposes of gaining entrance to defendant's wholesale warehouse.

3. SAME—WAREHOUSE PLATFORM AND STEPS—CONDITION OF PREMISES IN WINTER—QUESTION FOR JURY.

In action to recover for injuries sustained by plaintiff, a railroad employee, as he fell on some ice-covered steps lightly covered with snow while he was seeking an entrance to defendant's wholesale warehouse store, evidence that canopy over platform, adjacent to right of way of plaintiff's employer, was in such a condition as to permit water to drip from the end of the canopy onto the steps and freeze during the winter months and had been that way for some time before the accident and had created a hazardous condition *held*, sufficient to present question to jury as to whether defendant was negligent in the maintenance of that part of its premises.

4. SAME—OWNER OF PREMISES—DUTY TO INVITEES AND PUBLIC.

An owner of premises is under the duty of using such care as an ordinarily careful and prudent person would use under the same or similar circumstances to avoid causing injury to invitees or to the public generally.

5. SAME—ARTIFICIALLY CREATED DANGEROUS CONDITION OF PREMISES—WATER AND ICE.

One who creates a condition which artificially causes water to be precipitated in such a way as to result in the formation of ice, rendering a place unsafe for pedestrians, is answerable for negligence.

6. SAME—KNOWLEDGE OF ICY STEPS—DURATION OF DANGEROUS CONDITION.

Whether or not an artificially created dangerous condition of premises due to ice on steps at end of platform over which a canopy had been erected is one which was known by owner or is one of which he should have known depends upon how long such a condition had existed and had been apparent and where testimony indicates a general use by the public of

such premises and of the existence of such condition during winter weather, question of owner's negligence is for jury.

7. SAME—ICY STEPS LIGHTLY COVERED WITH SNOW—CONTRIBUTORY NEGLIGENCE.

In action for injuries sustained by plaintiff as he descended steps on defendant's premises, question of his contributory negligence was for jury where plaintiff testified that before he stepped down the step appeared to be covered with snow but discovered afterwards that steps were covered with ice lightly covered with snow.

8. DAMAGES—BACK INJURY—LOSS OF WAGES—DOCTORS' BILLS—PAIN AND SUFFERING.

Judgment of $10,000, entered after remittitur of $2,484 from verdict as rendered for plaintiff, a railroad warehouse foreman, in action for injuries to back sustained when he fell on defendant's ice-covered steps, *held*, not excessive, where at time of the accident plaintiff was 38 years old, healthy, able-bodied, earning $5.40 a day six days a week, sustained a loss in wages of approximately $3,300, had doctors' bills of $500, spends about three-fourths of his time in bed, and has suffered and will continue to suffer severe pain and difficulty in walking.

9. APPEAL AND ERROR—CONDUCT OF JUROR—FINDING OF COURT.

Finding of trial court, after investigation, that claim of alleged improper conduct of a juror was not established and that no impropriety occurred is affirmed under record presented.

WIEST, J., dissenting.

Appeal from Gogebic; Landers (Thomas J.), J. Submitted June 12, 1940. (Docket No. 24, Calendar No. 40,923.) Decided November 13, 1940. Rehearing denied February 7, 1941.

Case by Louis Perl against Cohodas, Peterson, Paoli, Nast Company, a Michigan corporation, for personal injuries sustained when he fell on ice accumulated on defendant's premises. Verdict and judgment for plaintiff. Remittitur filed by plaintiff. Defendant appeals. Plaintiff cross-appeals. Affirmed.

*Solomon W. Patek (Leonard J. McManman,* of counsel), for plaintiff.

*Charles M. Humphrey* and *Charles M. Humphrey, Jr.*, for defendant.

McAllister, J. Plaintiff brought an action for damages, claiming that he had sustained injuries from a fall on defendant's premises resulting from the latter's negligence. On trial before a jury, he was awarded a verdict of $12,484. The circuit court denied defendant's motion for a new trial, but ordered a remittitur of $2,484. Defendant appeals, and plaintiff cross-appeals.

Plaintiff was formerly a warehouse foreman in the city of Ironwood, employed by a railroad company. Defendant is a corporation engaged in carrying on a wholesale fruit, vegetable, tobacco, and confectionery business in a warehouse in the same city. The warehouse joins the right of way and is served by a spur track of the railroad company with which plaintiff was employed.

On the south side of the warehouse, defendant maintains a loading platform about four feet above the level of the street and extending approximately 75 feet across the side of the warehouse. Two doors open from this platform into the warehouse. The platform is accessible from the street level by steps at its east and west ends. Over the platform is a large canopy which extends over a portion of the steps at the west end, and on which ice and snow collect during the winter months. A gutter runs around the eave of the canopy and drains through a downspout at the east end of the canopy. It is alleged that defendant negligently permitted the canopy to sag at the west end, where it extends over a part of the steps, so that in winter weather, notwithstanding the gutter, water dripped down on the steps, where it froze and formed icy ridges rendering the steps slippery and dangerous. It is further

alleged that defendant knew of this condition and permitted it to continue.

About 1 o'clock in the afternoon of December 22, 1937, plaintiff went up on the platform, using the steps at the east end, for the purpose, he alleges, of recovering from defendant company a thermometer for the railway, and to inquire the price of potatoes. Finding the platform doors locked, he continued across the platform and was in the act of descending the steps on the west end thereof, to enter the warehouse by a doorway at the street level beside the steps, according to his allegation, when he slipped and fell, his back and spine striking the steps and causing him severe injuries. He testified that he used care in going down the steps but that a light, thin snow covered the ice and he did not see it or know it was there until he placed his foot on it and slipped. Defendant denied the steps were in a dangerous condition, or that it had any knowledge thereof; and denied that plaintiff had any right to be on the platform, claiming that his presence was that of a trespasser, or, at most, a licensee. Defendant further alleged that a door at the street level was the proper means of public ingress and egress to the warehouse, and denied that the public and patrons were invited upon the platform.

Defendant contends that the court erred in submitting the question of its negligence to the jury; that plaintiff was guilty of contributory negligence as a matter of law; that error was committed by the trial court in its submission of evidence and instructions to the jury; that the verdict was excessive; and that it is entitled to a new trial because of the misconduct of a juror.

It appears from the evidence that when freight cars arrive in Ironwood, it is necessary for employees of the railroad company to take the tempera-

ture in cars containing foodstuffs and produce; that the thermometers are left in the cars and often removed by the consignees when they unload the car. It was plaintiff's duty, as foreman, to see that such thermometers were placed in the car. On many occasions prior to the accident he had gone to defendant's premises to recover them for the railroad company. At the time that he received his injuries, he claims that he was engaged on a trip to the premises of defendant company to secure from defendant a thermometer, as well as to purchase vegetables. He further claims that he usually went into the building through the doors leading from the platform in question. Defendant denied that plaintiff had any rights on the platform as an invitee, and was, at most, a licensee. The court submitted to the jury the question of whether plaintiff was an invitee or a licensee, instructing them that if plaintiff were an invitee, defendant owed a duty to use ordinary care to maintain the premises and platform steps in a reasonably safe condition for use by the plaintiff; that if he were a licensee, defendant's duty was merely to refrain from wilful injury and to avoid exposing plaintiff to hidden perils.

Defendant claims that there was no evidence to show that plaintiff was an invitee, or that the public was invited to use the platform. It is said in 45 C. J. p. 814, that a person is an invitee where, for the purposes connected with the business conducted on the premises, he enters any place of business. "A servant who enters premises on the business of his master, in which business the master and the owner or occupant have a mutual interest, occupies the status of an invitee." 45 C. J. p. 818. "An invitation to enter premises carries with it the duty toward the persons invited to provide reasonably safe means of ingress and egress." 45 C. J. p. 834.

In regard to defendant's contention on this phase of the case, its claim cannot be sustained. In addition to plaintiff's testimony that he had used the premises in the manner above set forth over a period of years, numerous witnesses testified that the public used the platform and entered the store through the doors opening thereupon. It also appeared from the testimony of former employees of the defendant that customers came into the store from the platform and that there was a general use of the platform doors for ingress and egress. In 45 C. J. p. 1327, it is said:

"Inasmuch as the owner's duty of care toward trespassers, licensees and persons on the premises by invitation, varies, the status of the party injured is often in issue, and, in such cases, where the evidence is conflicting or inconclusive, it is for the jury to determine into which class plaintiff falls, and whether defendant exercised toward him the degree of care to which, under the law, he was entitled."

In *Schmidt* v. *Michigan Coal & Mining Co.,* 159 Mich. 308, plaintiff brought suit for personal injuries as a result of an explosion of a compressed air tank, located at the tipple of the defendant's mine. The evidence showed that plaintiff, a miner, in seeking employment at defendant's mine, was directed by the pit boss to return the following day. When he so returned, the tank exploded, resulting in plaintiff's injuries. The trial court had directed a verdict on the ground that the evidence showed that plaintiff was a trespasser, or a mere licensee. This court held that the question of whether plaintiff was a licensee or invitee, under the evidence, was one of fact to be submitted to the jury, and in passing upon the question said:

"Plaintiff is entitled to have the evidence presented by his case given the most favorable con-

struction it will bear in his favor, where a verdict has been directed against him. We are not able to say that, as a matter of law, there was no evidence of an implied invitation to go to the tipple on the day of the accident to consult the pit boss. A custom was shown that the usual thing for miners to do, at the Bay county mines, when seeking employment, was to go to the pit boss. Plaintiff had sought him out and was requested to return on Monday. On that day he went to the office, and from the evidence related by him relative to his conversation with the superintendent, it appears that the pit boss was the one who furnished the information when men were needed in the mines. There was evidence to submit the question to the jury whether an express or implied invitation to go to the tipple and ascertain from the pit boss, might not be inferred from what the superintendent said. There is abundant authority to sustain the contention that where there is evidence, though contradicted, from which an invitation might be inferred, it is a question for the jury.''

Under the evidence, the court properly submitted to the jury the question of whether plaintiff was an invitee or a licensee.

With regard to whether the question of defendant's negligence should have been submitted to the jury, there was a considerable body of testimony from several witnesses that, over a long period of time, during winter weather, water had dripped from the end of the canopy directly upon the steps of the platform; that this condition existed long before the accident, as well as afterward; and various witnesses had observed that such dripping water froze upon the steps from time to time and created a hazardous condition. Evidence was introduced as to the sagging of the canopy by an architect who had measured the distance between the canopy and the plat-

form; and although the platform was ascertained to be level, the height of the canopy above the platform varied, and the canopy was found to sag toward the west end. It is claimed that the proper method of ascertaining whether the canopy sagged would have been to place a level upon the canopy instead of measuring from the platform. Nevertheless, the admission of evidence thereon was not error. It further appeared from the testimony of one of the stockholders and directors of defendant company that water had often drained from the southwest corner of the canopy and that the condition of the canopy at the time of the trial was the same as at the time of the accident and for a long time prior thereto. If defendant's liability is to be predicated upon evidence that the canopy sagged in such a way that water dripped from the west end directly upon the steps and that from time to time such dripping water, in winter months, formed ice upon the steps, then the question of defendant's liability was for the jury, as there was sufficient evidence to submit such question to them.

What was defendant's duty to plaintiff, assuming that plaintiff was an invitee? It was to use the care that an ordinarily careful and prudent person would use under the same or similar circumstances to avoid causing injury to plaintiff or to the public generally. Cases on the identical question here presented are few. But general principles of liability are clear. In 13 R. C. L. p. 416, it is said:

"An abutting property owner who creates a condition which artificially turns water across a sidewalk in such a way as to freeze and render the walk unsafe, is guilty of creating and maintaining a nuisance, and is liable for injury to pedestrians thereby caused; as, for example, where water is cast on the sidewalk by drains leading from the

adjoining premises, or by conductor pipes constructed to carry water from the roofs of adjoining buildings. * * * The owner is not liable, however, where the water is merely permitted to flow from his premises naturally, and without any active interference on his part to cast it there, nor is he under any obligation under such circumstances to erect a barrier to keep the water off. Neither is he liable where the ice is formed by water from a burst pipe leading to a storage tank, when the break is not caused by any defect in the pipe, or by his negligence, although the water may have reached the sidewalk because the pipes designed to carry rain water were insufficient to carry it. But he is liable if he by the structures which he maintains upon his land, causes a substantially larger volume of water to be accumulated and discharged, and thereby contributes to form ice upon the walk so as to increase substantially the amount of such ice, although water from other sources contributes to the dangerous condition.''

In *Great Atlantic & Pacific Tea Co.* v. *McLravy* (C. C. A.), 71 Fed. (2d) 396, plaintiff, a customer at a grocery store operated by defendant, when leaving the store on a February afternoon slipped on an accumulation of ice and snow on the sill of the vestibule at the edge of the sidewalk but within the store. In sustaining a verdict for plaintiff, the court said:

"It is unquestionably the law that a storekeeper owes to his customers the duty of exercising reasonable care to keep his premises and access thereto in a safe condition for their use, and upon the evidence we do not think that appellant was entitled to a directed verdict upon either of the grounds urged.''

Most of the cases involving ice and snow concern actions against municipalities for such accumulations on sidewalks. However, the standard of duty

of the municipality to those who use its streets and sidewalks is the same as that of the owner or occupier of premises to an invitee; and the rule with regard to municipalities may serve to illuminate the issues herein presented.  In an extensive note and annotation on the subject in 13 A. L. R. p. 18, it is said:

"The foundation, generally, of the liability of a municipality for injuries from snow or ice upon its sidewalks, is its negligence in failing to keep them safe for public travel.     *     *     *

"The duty of a municipality in this respect is to use only reasonable care to see that the sidewalks are reasonably safe for persons exercising ordinary care and prudence."

In such cases the criterion is whether the danger was caused by natural or unnatural and artificial conditions.  And it is said in the note above referred to in 13 A. L. R. p. 37:

"The courts are quite well agreed that if a leader is constructed from the eaves trough of an adjoining building in such a way, or is so defective, as to cast the water upon the walk the municipality is liable for injuries caused by ice resulting from the freezing of such water."

The foregoing observations and authorities are referred to only by way of analogy.  We are not here concerned with the question of liability of a municipality for injuries resulting from the formation of ice on its streets.  There is no authority, however, in this State holding that one who creates a condition which artificially causes water to be precipitated in such a way as to result in the formation of ice, rendering a place unsafe for pedestrians, is not answerable for negligence.  In *Mayo* v. *Village of Baraga,* 178 Mich. 171, it was held that municipalities are not liable for failure to protect pedestrians from danger

caused by the natural accumulations of ice or snow upon sidewalks. In *Gerrie* v. *City of Port Huron,* 226 Mich. 630, it was held that, where a creosoted wooden pavement approach to a bridge was not slippery when bare, no negligence could be imputed to defendant city because it was slippery when coated with ice, since the city is not required to guard against the climatic incident of sleet or rain freezing on the pavement and rendering it slippery. In *Hopson* v. *City of Detroit,* 235 Mich. 248 (48 A. L. R. 1150), it was held that ice on a sidewalk, whether on level places or in depressions, constituted no defect entailing liability of the municipality. These cases only sustain the well-understood general rule. In the instant case, the gist of plaintiff's claim is that there was an unsafe formation of ice rendering the steps in question dangerous, which condition was caused artificially by defendant, and was not the result of the natural precipitation of rain or snow.

In *Chatkin* v. *Talarski,* 123 Conn. 157 (193 Atl. 611), plaintiff, in making a call at an undertaker's establishment, was injured by a fall on the icy steps leading to the front entrance. The building had a flat roof, under the eaves of which was a conductor pipe with holes in it from which water leaked, dripping upon the steps below. As a result of the freezing of the water on the steps, ice formed; and, when defendant was descending the steps, she slipped and received the injury complained of. The appellate court sustained a judgment for plaintiff on the ground that it was defendant's duty to use reasonable care to keep the steps in a reasonably safe condition.

We are of the opinion that the evidence showing the sagging of the canopy, causing the water to drip upon the platform steps and resulting in formation of dangerous ridges of ice, presented a question of

fact as to defendant's negligence in keeping the premises in a reasonably safe condition for use by plaintiff and the public. Whether defendant had notice or should have known of the dangerous condition of the steps depended upon how long such a condition had existed and had been apparent. Because of the maintenance of such a platform and steps by defendant and its use by the public, together with the testimony of numerous witnesses as to the dangerous condition of the steps during certain periods of winter weather, this question was one for the jury.

With the contention that plaintiff was guilty of contributory negligence as a matter of law, we are unable to agree. He testified that before he placed his foot on the step it appeared to be covered with snow; but that after his fall he saw that what he had thought was snow was a thick ridge of ice which had been lightly covered with snow. It cannot be said, under these circumstances, that, as a matter of law, plaintiff failed to use the care that an ordinary careful and prudent person would have exercised under the same or similar circumstances. The determination of this question was for the jury.

Plaintiff, at the time of the accident, was 38 years old; he had worked continuously for 22 years, with the exception of a few days off on account of a cold in his back. He had not suffered illness or poor health during that time. He had been warehouse foreman for four years before his injuries. On January 8, 1938, he was examined at his home by Dr. Nezworski, a regularly practising physician. At that time there was evidence of severe contusion and sprain of the muscles in the right lumbar region, with hemorrhage and subcutaneous extravasation of blood. The hemorrhage was five inches in diameter and appeared to be, at that time, about two weeks old.

The skin was purplish yellow and the area was swollen. The doctor ordered plaintiff to bed, and over a period of two months gave him vaccine fever treatment and diathermy to relieve the pain; he also prescribed a corset for plaintiff to wear in bed. Later plaintiff was sent to a specialist in Milwaukee and afterwards wore a different type of corset, over a foot wide, made of canvas and steel braces, supported around the shoulder by leather straps. Plaintiff was also obliged to lie in bed on his back for a period of approximately 10 days while weights were applied to his legs in order to stretch the muscles in his back. Dr. Eisele, a physician specializing in industrial accident cases for a number of years for many large corporations, after an examination of plaintiff testified that there was a limitation of the use of his right leg and that a set of muscles in the lumbar region would contract in spasm on pressure. Both physicians gave as their opinion that the injuries could have resulted from the fall; that plaintiff suffered severe pain; that he was disabled and would, in all probability, continue to be disabled for an additional period of a year from the time of the trial; and that his pain would accompany such disability. Plaintiff himself testified as to his pain and difficulty in walking. At present he spends about three-fourths of his time in bed. His doctor bills will amount to approximately $500 for medical treatment during disability. At the time of his injury, plaintiff was a strong, healthy, able-bodied man, earning $5.40 per day and working six days a week. His loss of wages for the two-year period would amount to approximately $3,300. Loss of wages and doctors' bills would total $3,800. The principal element of damage in this case appears to be pain and suffering which was fairly proved. On an examination of the evidence we are in accord with the

finding of the trial judge that a judgment of $10,000 is not excessive and is fair compensation to plaintiff for the damages he has suffered.

We are in accord with the trial court's finding, after an investigation of alleged improper conduct of a juror, that such claim was not established and that no impropriety occurred.

No other questions discussed require consideration.

Judgment affirmed, with costs to plaintiff.

BUSHNELL, C. J., and SHARPE, CHANDLER, NORTH, and BUTZEL, JJ., concurred with McALLISTER, J.

WIEST, J. (*dissenting*). Under the evidence, medical and lay, I am of the opinion the verdict awarding plaintiff damages to the amount of $12,484 was grossly excessive, and for this reason the trial court should have granted defendant's motion for new trial instead of requiring plaintiff to remit only $2,484.

The judgment should be reversed, with a new trial and with costs to defendant.

The late Justice POTTER took no part in this decision.