SALVATI v DEPARTMENT OF STATE HIGHWAYS

Docket No. 64143. Decided December 23, 1982. On application by the defendant for leave to appeal the Supreme Court denied leave to appeal from the Court of Appeals by an equally divided Court. Rehearing denied 417 Mich 1105.

Helen Salvati, the widow of Carmen Salvati, brought an action for wrongful death against the Department of State Highways, alleging that Mr. Salvati's death in a motor vehicle accident on an icy bridge on I-75 at Goddard Road was caused by the defendant's failure to post adequate warnings that ice might unexpectedly accumulate on the bridge. The Court of Claims, Harry J. Dingeman, Jr., J., found that posted signs "watch for ICE on bridge" did not adequately warn motorists of potentially hazardous conditions, and granted judgment for the plaintiff. The Court of Appeals, T. M. Burns and D. E. Holbrook, JJ. (Allen, P.J., dissenting), affirmed the decision of the trial court, but remanded the case for proceedings on the issue of contributory negligence (Docket No. 78-2097). The defendant applies for leave to appeal.

Leave to appeal is denied by an equally divided Court.

Justice Coleman, joined by Chief Justice Fitzgerald and Justice Ryan, would reverse the judgment:

1. The disputed issue in this case is whether the Department of State Highways has breached its statutory duty to maintain its highways in a reasonably safe condition by posting traffic signs that failed to serve their intended purpose of warning motorists of hazardous conditions.

2. In general, the question of the adequacy of a particular system of traffic signs is to be resolved by the trier of fact. Compliance with the state's manual of uniform traffic-control

REFERENCES FOR POINTS IN HEADNOTES

[1, 2, 4, 5] 39 Am Jur 2d, Highways, Streets, and Bridges §§ 397, 398.

[3] 39 Am Jur 2d, Highways, Streets, and Bridges §§ 340, 579.

[4, 5] 39 Am Jur 2d, Highways, Streets, and Bridges § 506.

Liability in motor vehicle cases, of governmental entity for injury or death resulting from ice or snow on surface of highway or street. 97 ALR3d 11.

devices should not wholly absolve the highway authority of liability, but may be considered in determining the reasonableness of the state's actions at the time of the accident. The trier of fact in this case committed a mistake in finding that the signs posted by the defendant at the approach to the bridge failed to inform the plaintiff's decedent adequately of the possibility that a hazardous condition existed on the bridge. The defendant is not required to do more than what is reasonable under the circumstances, nor to be an insurer of the travelers of the roadway. In addition to routinely patrolling the I-75 bridges with salt trucks when sudden "preferential" icing is most likely to occur, the defendant conspicuously placed on both sides of the roadway approaching the bridge reflectorized signs with the legend "watch for ICE on bridge"; the signs conformed to the state's manual of uniform traffic-control devices. The defendant's acts at the time of the accident were entirely reasonable.

3. That the signs did not instruct the driver in the action to be taken if ice was encountered on the bridge does not necessarily make the signs meaningless. Many traffic signs imply, rather than expressly direct, responses such as "use caution" or "reduce speed". The briefer the message, the more likely it is to be comprehended, in a short time, by a motorist driving on the highway. The ordinary motorist should have sufficient training or experience to know what response is expected for the particular warning posted.

4. The trial court found that the signs were deficient because motorists noticed them less than 50% of the time while driving at night. That could be attributable to the drivers' inattentiveness, drowsiness, or concentration on an unfamiliar road, rather than to any inadequacy of the sign. Even if a more noticeable flashing warning device had been available at the time, there would be no reliable means of predicting or detecting ice on the bridge so that the device could be activated. The trial court's finding was based upon the assertion of an expert witness, made without foundation laid or proper testimony of any kind to support it.

5. The trial judge found that the warning "watch for ICE on bridge" affords incongruous advice because it advises the driver to look for something that cannot be seen. However, the trial court misconstrued the sense of the word "watch" as it was used on the signs. It means only that the driver should be aware of the possibility that an icing condition exists on the bridge and prepare to take the necessary cautionary measures.

The trial judge clearly erred in finding that the traffic signs in this case were inadequate to warn motorists of the hazard.

Justice Levin, joined by Justices Kavanagh and Williams, would deny leave to appeal or would affirm the judgment of the Court of Appeals because the finding that the warning signs erected by the defendant failed to serve their intended purpose was not clearly erroneous.

1. A governmental agency having jurisdiction of a highway has the duty to maintain the highway in reasonable repair so that it is reasonably safe and convenient for public travel; that includes the obligation to post warnings at points of special danger. Failing to warn or warning inadequately may render the agency liable in tort.

2. In this case, a phenomenon known as preferential icing, the sudden formation of ice on a bridge surface while the road surface approaching the bridge remains dry, occurred and led to the fatal accident. The phenomenon was known to have occurred at the bridge previously under similar atmospheric conditions. The trial court found that signs posted at the bridge approach did not adequately warn of the danger. Such findings of fact are not to be set aside on review unless clearly erroneous, that is, unless the reviewing court is left with the definite and firm conviction that a mistake has been committed. The issue is not whether the agency could have done more, but whether its warnings were adequate. On the facts of the case, the warning to motorists merely to "watch" for ice without indicating the imperative necessity of reducing speed was inadequate.

92 Mich App 452; 285 NW2d 326 (1979) affirmed.

OPINION BY COLEMAN, J.

1. HIGHWAYS — TRAFFIC SIGNS — NEGLIGENCE.

*The statutory duty of a governmental agency to maintain its highways in a reasonably safe condition includes the duty to post and maintain traffic signs at a point of hazard (MCL 691.1402; MSA 3.996[102]).*

2. HIGHWAYS — TRAFFIC SIGNS — NEGLIGENCE.

*Compliance of a traffic sign with the state's manual of uniform traffic-control devices should not wholly absolve a governmental agency of liability for the statutory duty to maintain its highways in a reasonably safe condition, but may be considered in determining the reasonableness of the state's actions in posting*

traffic signs that allegedly were inadequate to warn motorists of a hazard (MCL 257.608, 691.1402; MSA 9.2308, 3.996[102]).

3. HIGHWAYS — TRAFFIC SIGNS — NEGLIGENCE — QUESTION OF FACT.

The adequacy of a particular system of traffic signs erected by a governmental agency to warn motorists of a hazard, generally, is a question to be resolved by the trier of fact (MCL 691.1402; MSA 3.996[102]).

4. HIGHWAYS — TRAFFIC SIGNS — NEGLIGENCE — BRIDGES.

A finding that the Department of State Highways breached its statutory duty to maintain its highways in a reasonably safe condition by posting traffic signs which were inadequate to warn motorists that hazardous ice might unexpectedly accumulate on a bridge was clearly erroneous where the Department of State Highways conspicuously placed on both sides of the roadway approaching the bridge reflectorized signs with the legend "watch for ICE on bridge", which conformed to the state's manual of uniform traffic-control devices, and routinely patrolled the highway's bridges with salt trucks at the times when sudden "preferential" icing was most likely to occur (MCL 257.608, 691.1402; MSA 9.2308, 3.996[102]).

OPINION BY LEVIN, J.

5. HIGHWAYS — TRAFFIC SIGNS — BRIDGES — NEGLIGENCE.

Findings by a trial court that signs warning motorists of possible icing on a bridge were inadequate to warn motorists of the danger of preferential icing were not clearly erroneous, where the signs warned motorists merely to "watch" for ice on the bridge without indicating the imperative necessity of reducing speed.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Thomas J. Killeen, Jr.,* Assistant Attorney General, for the defendant.

COLEMAN, J. Preferential icing is a meteorological phenomenon in which ice forms on a bridge deck at a time when the surface of the bridge approaches is clear and dry. This intermittent, unpredictable and often rapidly developing condition occurs through the interplay of a complex of factors, among them relative humidity, ambient

air and bridge deck temperatures, and wind velocity and direction.[1]

In this wrongful death case, we are asked to determine whether the trial judge clearly erred in finding that the two "WATCH FOR ICE ON BRIDGE" signs erected by defendant at the approach to the Interstate-75 bridge over Goddard Road were inadequate to warn passing motorists, in particular plaintiff's decedent, of a possible preferential icing hazard. GCR 1963, 517.1.

## I

The pertinent facts are not in dispute.

On February 17, 1972, at approximately 6:20 a.m., plaintiff's decedent, Carmen Salvati, was instantly killed when the automobile he was driving collided with a tractor-trailer which earlier had jackknifed on the I-75 bridge over Goddard Road near Detroit. When the accident occurred, the bridge was icy and hazardous, although the bridge approaches were clear and dry. A salt patrol provided by the Wayne County Board of Road Commissioners, pursuant to a contract with defendant, routinely operated on I-75 in the area of the Goddard Road bridge on weekday mornings from 6 a.m. to 7:30 a.m.[2] On the morning in question, it had passed over the bridge shortly before 6 a.m. without detecting any ice. Ten to fifteen minutes later, the driver of the salt truck saw that ice was starting to form on bridges farther along the route, so he immediately began to salt and doubled back to apply salt to bridges which only a short

---

[1] Other factors include the absence or presence of salt residues, tire friction, air turbulence and the absence or presence of sunlight.

[2] These are the hours during which preferential icing is most likely to occur. The salt patrol operated from November to mid-April.

time before had been dry. By the time he reached the Goddard Road bridge, Mr. Salvati's fatal accident had already occurred.

At the time of the accident, two reflectorized signs bearing the legend "WATCH FOR ICE ON BRIDGE" were positioned 1000 feet in advance of the bridge, one 12 feet off the right shoulder, the other 10-1/2 feet off the left shoulder.[3] The posted speed limit on I-75 was 70 mph.

Trial was conducted in the Court of Claims in February, 1978. At trial, one of plaintiff's expert witnesses, Ronald Mourant, a Wayne State University psychologist with a Ph.D. in industrial engineering, testified that on the basis of "past studies" (not described) a system of traffic signs such as that in use at the Goddard Road bridge was inadequate because motorists passing would "only see those signs at most 50 percent of the time and at nighttime conditions you could expect this to be less". Dr. Mourant's evaluation of the Goddard Road bridge system of signs was based upon his personal observation of the signs on the bridge, as well as his analysis of similar signs in other states. (However, it is noted that he was under the erroneous impression that only one "WATCH FOR ICE ON BRIDGE" sign had been placed in advance of the Goddard Road bridge.) He reasoned that a "WATCH FOR ICE ON BRIDGE" sign, even if reflectorized, as were these, does not require the driver to make an explicit response. The psychologist advised use of a sign with a flashing amber light and a message directing the driver to

---

[3] Plaintiff does not claim that the "WATCH FOR ICE ON BRIDGE" signs failed to conform to the specifications outlined in the Michigan Manual of Uniform Traffic Control Devices. The manual indicates no alternative sign to be used.

reduce speed. The defense primarily focused upon the unavailability of a reliable and accurate ice detection and warning system.

The trial judge awarded plaintiff $175,000, premising the award upon his finding that defendant failed adequately to warn of the hazardous preferential icing condition. In a 2-to-1 decision, the Court of Appeals agreed that defendant was negligent, but remanded to the trial court for findings on the issue of contributory negligence.[4]

## II

The instant controversy focuses not upon whether the condition known as preferential icing is a natural accumulation of ice, a defect for which defendant may not be held liable,[5] nor does this case involve an assertion that there was a flaw in the design or construction of the bridge itself.[6] Instead, the disputed issue is whether defendant has breached its statutory duty to maintain its highways in reasonably safe condition by posting traffic signs that failed to serve their intended purpose of warning motorists of hazardous conditions.

MCL 691.1402; MSA 3.996(102) imposes upon

---

[4] Despite a timely application for leave to appeal with this Court, the trial judge proceeded with the issue on remand, finding that plaintiff's decedent was not contributorily negligent.

[5] *Wesley v Detroit*, 117 Mich 658; 76 NW 104 (1898); *Johnson v Marquette*, 154 Mich 50; 117 NW 658 (1908); *Perl v Cohodas, Peterson, Paoli, Nast Co*, 295 Mich 325; 294 NW 697 (1940). See, also, *Greenleaf v Dep't of State Highways*, 90 Mich App 277, 283; 282 NW2d 805 (1979), wherein the Court of Appeals included preferential icing within the category of natural conditions for which liability may not be incurred.

[6] Plaintiff's complaint alleged negligent construction of the pavement on the I-75 Goddard Road bridge, but no proofs on this allegation were presented at trial.

defendant an affirmative obligation to "maintain the highway in reasonable repair so that it is reasonably safe and convenient for public travel". A traffic sign, once erected, becomes an integral part of the physical structure of the highway, and thus the duty to maintain a highway in reasonable repair encompasses the maintenance of traffic signs.[7] A governing unit may incur liability under the broad concept of "traffic sign maintenance" in the following ways: for failing to properly maintain a sign placed on the roadway, *O'Hare v Detroit,* 362 Mich 19; 106 NW2d 538 (1960); for failing to erect any sign or warning device at a point of hazard, *Bonneville v Alpena,* 158 Mich 279; 122 NW 618 (1909); *Mullins v Wayne County,* 16 Mich App 365; 168 NW2d 246 (1969); for positioning an improper system of signs on the roadway, *National Bank of Detroit v Dep't of State Highways,* 51 Mich App 415; 215 NW2d 599 (1974); or for placing a sign which inadequately informs approaching motorists of a hazard, *Lynes v St Joseph County Road Comm,* 29 Mich App 51; 185 NW2d 111 (1970). While the highway authority has discretion in the erection of traffic control signs, MCL 257.608; MSA 9.2308, this discretion may not be capitalized upon to shield the authority from liability for highway defects, see *Mullins, supra,* 381, nor should compliance with standard manual specifications similarly act wholly to absolve the highway authority from liability. However, *National Bank of Detroit, supra,* suggests that compliance with traffic manual standards is a factor to consider in determining the reasonableness of the state's actions at the time of the accident.

---

[7] *O'Hare v Detroit,* 362 Mich 19; 106 NW2d 538 (1960); *Williams v Dep't of State Highways,* 44 Mich App 51; 205 NW2d 200 (1972); *Lynes v St Joseph County Road Comm,* 29 Mich App 51; 185 NW2d 111 (1970).

In general, the question of the adequacy of a particular system of traffic signs is to be resolved by the trier of fact. 18 Am Jur Proof of Facts 2d, Highway Defects—Warning Device, § 7, p 509.

Our review of this case leaves us " 'with the definite and firm conviction that a mistake has been committed' " by the trier of fact. *Tuttle v Dep't of State Highways*, 397 Mich 44, 46; 243 NW2d 244 (1976). We cannot agree that the two "WATCH FOR ICE ON BRIDGE" reflectorized signs posted by defendant at the approach to the Goddard Road bridge failed adequately to inform plaintiff's decedent of the possibility that a hazardous condition existed on the bridge, so as to enable him, in the exercise of ordinary care, to avoid injury. We will not require of defendant more than what is reasonable under the circumstances; nor will we make defendant an insurer of the travelers of the roadway.

In addition to its program of routinely patrolling the I-75 bridges during the hours in which preferential icing is most likely to occur, defendant conspicuously placed, on either side of the roadway not one, but two reflectorized signs reading "WATCH FOR ICE ON BRIDGE" which conformed to traffic manual specifications. This we find to be entirely reasonable.

Although we hesitate to say that defendant could not possibly have done more, we are at a loss to say what that "more" could have been. Apparently, applying salt to a dry road surface as a preventive measure is a useless procedure, since most of it is blown to the roadside by vehicles as they pass by. Further, abundant evidence exists to show that the technology for a flashing "Reduce

Speed—Ice on Bridge" sign, such as the one suggested by Dr. Mourant, was unperfected at the time of the accident. Short of stationing an employee at each point throughout the state where preferential icing might occur, defendant had no reliable means of predicting or detecting the presence of ice so that a flashing warning sign could be activated.

## III

We disagree with the lower courts' conclusions that the "WATCH FOR ICE ON BRIDGE" signs erected by defendant were inadequate to apprise approaching motorists of the hazard of preferential icing. Although the signs did not instruct the driver in the action to be taken should ice be encountered on the bridge, we think that this lack of instruction does not necessarily make the signs meaningless. We can think of many worthwhile and significant traffic signs which are similarly non-instructive, e.g., "Deer Xing", "Road Ends". These signs imply, rather than expressly direct, responses such as "use caution" or "reduce speed". We should recognize three important considerations: first, that the briefer the message, the more likely it is to be comprehended by a motorist (especially one driving on an Interstate roadway); second, that the less time the reading consumes the less dangerous is the diversion; and third, that the ordinary motorist should have received sufficient training or experience to know what response is expected should a particular danger be posted. We do not believe that the "WATCH FOR ICE ON BRIDGE" signs used by defendant were inadequate because the desired response was not expressly commanded on the sign itself.

We also do not agree with the trial judge's determination, based upon the unfounded assertion of Dr. Mourant, that the reflectorized signs were deficient because the motoring public noticed them less than 50 percent of the time while driving at night. If some nighttime drivers fail to see a properly reflectorized sign, it could be as attributable to many factors, such as the drivers' inattentiveness, drowsiness, or concentration on an unfamiliar road as it is to some supposed inadequacy in the sign. Although a flashing sign might have been more noticeable—had it been developed—once again the effectiveness of such a sign would have been dependent upon the existence of a reasonable and reliable ice detection system for its activation.

In essence, there was no foundation laid or proper testimony of any kind to support the bald estimate of Dr. Mourant upon which the trial judge, in part, based his conclusion. Nor was a better system then available to defendant.

Finally, we do not agree with the trial judge's finding that a "WATCH FOR ICE ON BRIDGE" sign affords "incongruous advice" because it advises one to look for that which cannot be seen. The trial judge misconstrued the sense in which the word "watch" is used in the sign legend. *The American Heritage Dictionary of the English Language* (1969) does define "watch" as "to look or observe attentively or carefully; be closely observant". But another definition of "watch", one which more logically applies to traffic control, is "to be on the lookout or alert; be constantly observant or vigilant". The word "watch" in "WATCH FOR ICE ON BRIDGE" means only that the driver should be aware of the possibility that an icing condition exists on the bridge and that he or she should

prepare to take the necessary cautionary measures if ice is encountered.

In the aggregate, we have "a definite and firm conviction" that a mistake was made by the trier of fact, *Tuttle, supra.*

Accordingly, in lieu of granting leave to appeal, pursuant to GCR 1963, 853.2(4), we reverse the judgments of the Court of Appeals and the trial court and remand this case to the Court of Claims for further proceedings consistent with this opinion.

Reversed and remanded.

FITZGERALD, C.J., and RYAN, J., concurred with COLEMAN, J.

LEVIN, J. *(to affirm).* The question presented in this wrongful death action is whether traffic signs posted by the defendant, Michigan Department of State Highways, adequately warned of a hazardous condition and whether, by posting the signs, the defendant discharged its statutory duty to maintain the highways in a condition reasonably safe and fit for travel.

We would deny leave to appeal or, if leave to appeal is granted, affirm. The circuit judge did not clearly err in finding that two "WATCH FOR ICE ON BRIDGE" signs erected by the defendant at the approach to the Goddard Road bridge failed to serve their intended purpose of warning passing motorists, in particular plaintiff's decedent, of a possible preferential icing condition.

I

On February 17, 1972, shortly after 6 a.m.,

plaintiff's decedent, Carmen Salvati, was killed when the vehicle he was driving struck a truck which had jackknifed blocking two lanes and part of the third on the Interstate-75 bridge over Goddard Road. This was the fourth in a series of accidents which occurred when a meteorological phenomenon known as preferential icing developed on the bridge deck at a time when the bridge approaches were clear and dry.

Preferential icing can almost instantaneously arise when the humidity is over 85% and the air temperature is a few degrees higher than a bridge surface of less than 32° F. The phenomenon occurs regularly on Michigan bridges and overpasses from November to April between 6 a.m. and 7:30 a.m.

The highway department, in response to this recurrent problem, had contracted with the Wayne County Road Commission to have a salt truck patrol I-75 in the vicinity of the Goddard Road bridge on weekday mornings. On the morning in question, the truck crossed the Goddard Road bridge shortly after 6 a.m. without detecting any ice. Farther along the route, the driver of the truck observed that ice was starting to form on the bridges, but by the time he doubled back to the Goddard Road bridge the accidents had occurred.

At the time of the accident, two reflectorized signs reading "WATCH FOR ICE ON BRIDGE" were placed 1,000 feet before the start of the bridge on either side of the highway. The posted speed limit on I-75 was 70 mph.

II

A governmental agency having jurisdiction of a

highway has the duty under the governmental tort liability act to "maintain the highway in reasonable repair so that it is reasonably safe and convenient for public travel". MCL 691.1402; MSA 3.996(102).

Before the governmental tort liability act was enacted, this Court held that a municipality is not liable for an accident that is caused by traveling on a natural accumulation of ice and snow. *Johnson v Marquette,* 154 Mich 50, 53; 117 NW 658 (1908); *Lubbers v Manlius Twp,* 172 Mich 387, 391; 137 NW 804 (1912). Preferential icing has been regarded as such a natural accumulation of ice for which a governmental agency is not liable.

A governmental agency having jurisdiction of a highway has the obligation to post traffic signs and to warn motorists at points of special danger. *National Bank of Detroit v Dep't of State Hwys,* 51 Mich App 415; 215 NW2d 599 (1974). Liability may arise for failing to erect a sign or barrier warning at a point of hazard, *Mullins v Wayne County,* 16 Mich App 365; 168 NW2d 246 (1969), or for posting a sign which inadequately warns of an approaching danger, *Lynes v St Joseph County Road Comm,* 29 Mich App 51; 185 NW2d 111 (1970).

In the instant case, the circuit judge found that the signs posted at the site of the accident did not adequately warn of the danger of possible preferential icing conditions for three reasons:

"The sign language 'Watch for ICE on Bridge' hardly can be said to be meaningful when it gives no instruction to motorists as to the action or precaution to be taken if there is ice on the bridge. Its visibility in the dark and its 'noticeability' by motorists are highly negative factors, in view of the expert testimony that

tests indicate that motorists see such a sign less than fifty (50%) percent of the time. Lastly, the message 'Watch for ICE on Bridge' seems to be incongruous advice in view of the testimony that when ice is present on the bridge deck surface it cannot be seen."

A judgment was entered against the defendant for $175,000 which was then reduced by $22,000 by virtue of a consent judgment in plaintiff's favor in a companion case. The Court of Appeals affirmed.[1]

### III

GCR 1963, 517.1, modeled on FR Civ P 52(a), provides that "[f]indings of fact shall not be set aside unless clearly erroneous". In *United States v United States Gypsum Co,* 333 US 364, 394; 68 S Ct 525; 92 L Ed 746 (1948), the United States Supreme Court said that the "clearly erroneous" test is equally applicable to "inferences drawn from documents or undisputed facts", and that a finding is clearly erroneous when the reviewing court is left with "the definite and firm conviction that a mistake has been committed" by the trier of fact. This Court adopted that standard in *Tuttle v Dep't of State Hwys,* 397 Mich 44, 46; 243 NW2d 244 (1976).

The lead opinion expresses a definite and firm conviction that a mistake was made by the circuit judge, a view which rests in part on the belief that a more effective means of warning motorists of the possibility of preferential icing was not available to the defendant on the date of the accident.

---

[1] *Salvati v Dep't of State Hwys,* 92 Mich App 452; 285 NW2d 326 (1979).

Plaintiff's expert witness, Ronald Mourant, testified that on February 17, 1972, there were signs in this state that could have been utilized to adequately warn passing motorists of the possibility of preferential icing. A flashing amber sign could have been set to turn on automatically at 6:00 and off at 7:30 every morning from November to April without regard to whether there was preferential icing. A provision could be made to permit manual operation so that a person on road patrol could turn the lights off after checking the air temperature. Such a sign could display an instructive and meaningful message, as proposed by the Court of Appeals, "Reduce Speed—Ice Condition on Bridge, When Highway is Dry".

The lead opinion assumes that the effectiveness of an alternative sign depends on there being a reliable means of predicting or detecting the presence of ice which would activate a flashing warning sign only when an ice condition had actually developed on the bridge deck. While such a system might be preferable, studies have shown that a sign illuminated constantly during particular hours is also effective. For example, in Kentucky a flashing sign reading "Reduce Speed—Ice on Bridge" proved to be most effective. Motorists reduced their speed from 65 to 35 mph.

Thus, assuming *arguendo* that there was indeed no reliable ice detection system for the activation of a flashing sign, it appears that a better system than that employed by the defendant was available.

## IV

The issue before us is not whether the defendant

could have done more, but whether the steps that
were, in fact, taken were adequate to warn the
motoring public of the dangerous condition.

Proper use of signs requires a warning commen-
surate with the degree of danger. A review of the
record reveals that preferential icing on a lengthy
bridge deck is a particularly hazardous road condi-
tion. The phenomenon occurs when the highway
and bridge approaches are clear and dry. More-
over, in the early morning hours of the winter
when this type of icing most frequently develops it
is dark and the ice itself does not become visible
until one is upon it.

The bridge signs in question are utilized by the
defendant, without differentiation in respect to the
length of the bridge, at every highway bridge
where the length of the bridge deck is in excess of
50 feet. The warning message is the same al-
though the degree of danger increases the greater
the distance the motorist must travel to cross the
ice condition. A motorist traveling at the speed of
50 miles per hour will traverse an icy bridge deck
of 50 feet in approximately two-thirds of a second,
less time than required for normal driver reaction.
It is likely that the vehicle will cross a 50-foot icy
bridge and reach the dry portion of the highway or
shoulder, thereby allowing the motorist to maneu-
ver and regain control.

A preferential icing condition on the Goddard
Road bridge with its 1,939 feet of length creates
considerably more danger than on a 50-foot bridge
deck. A motorist traveling at 50 miles per hour
requires approximately 26-1/2 seconds to traverse
the Goddard Road bridge. The probability of a
motorist losing control increases when he is re-

quired to traverse an icing condition in excess of 1/3 of a mile, and this is more so when the icing condition is encountered unexpectedly. The vehicle of a motorist who loses control on the Goddard Road bridge is likely to come to a stop on the icy bridge deck after caroming off the barricades or at the end of a spin-out.

The difficulty of quickly maneuvering or of moving a vehicle from a stopped position on ice is well known to all motorists. A motorist attempting to regain control of his vehicle may be blocking one or more driving lanes and exposed to the danger of being struck by another approaching vehicle unable to stop because of the icing condition. This is what happened on February 17, 1972; the first accident involved a vehicle caroming off the barricade, and the third accident involved a truck jackknifing and blocking the three lanes on the bridge in an effort to avoid colliding with a vehicle that had spun out in front of the truck. In the fourth accident, decedent, unable to stop because of the icing condition, struck the truck blocking the driving lanes.

The highway approach to the Goddard Road bridge is straight, without curves or bends that might require a motorist to decrease his speed. The straight highway approach, coupled with a posted speed limit of 70 miles per hour, made it likely that a motorist would encounter a preferential icing condition on the bridge at a high speed.

The circuit judge did not err in concluding that a preferential icing condition on the Goddard Road bridge creates a greater danger than a preferential icing condition on a 50-foot bridge and that, because proper use of signs requires a warning com-

mensurate with the degree of danger, the use of
the same bridge sign at a 50-foot bridge and the
Goddard Road bridge was a breach of the defen-
dant's obligation to properly warn of danger.

We cannot agree that the signs erected by defen-
dant were adequate, although they did not instruct
approaching motorists of the action to be taken
should ice be encountered on the bridge. To be
sure, as a generalization, the briefer a message,
the more comprehensive it is likely to be, and the
less the distraction of the driver. However, a mes-
sage may be so brief that it is not adequately
meaningful. While every sign need not expressly
command a desired response in order to be mean-
ingful, certain dangers are so unusual and hazard-
ous that the precaution required should be ex-
plicit.

Simple non-instructive signs such as "Deer
Xing" and "Road Ends" are adequate to warn of
their dangers because the ordinary motorist has
"sufficient training or experience to know what
response is expected".[2] The same cannot be said of
a preferential icing condition. The phenomenon
occurs in the early morning hours of the winter
when many motorists are not on the road. A
driver of a commercial truck may have had the
experience of surviving an encounter with prefer-
ential icing and may reduce his speed when ap-
proaching a bridge during these hours. An ordi-
nary motorist, however, may be unfamiliar with
the type of icing involved in this case.

It is not necessary to rely on Dr. Mourant's
testimony regarding the visibility and the intelligi-
bility of the sign. In *Greenleaf v Dep't of State*

---

[2] *Ante*, p 717.

*Hwys,* 90 Mich App 277; 282 NW2d 805 (1979), the Court of Appeals, as in the instant case, affirmed a judgment of the Court of Claims in favor of the plaintiff in a wrongful death and personal injury action which arose in 1971 as a result of preferential icing on a bridge described in the opinion as "exceedingly high and long". *Greenleaf, supra,* p 280. There also the sign read "WATCH FOR ICE ON BRIDGE" and the circuit judge "chose to believe plaintiffs' witnesses and found that the sign was not visible to passing motorists". In 1970, there were ten accidents; in 1971, seven accidents on this bridge. *Greenleaf, supra,* p 284.

When there is preferential icing, it is imperative that the driver reduce his speed, not merely "watch" and be vigilant, for once the driver hits the unseen ice, he often will be unable to stop. He is likely to skid and lose control of his vehicle. The circuit judge could properly find that the sign, in failing to alert drivers of the imperative necessity of reducing speed, was inadequate.

We would deny leave to appeal or would affirm.

KAVANAGH and WILLIAMS, JJ., concurred with LEVIN, J.

RILEY, J., took no part in the decision of this case.